**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

JANICE GERONIMO,                )
                                )
        Plaintiff,              )
                                )
v.                              )        No. 1:23-cv-11138-JEK
                                )
MELROSE-WAKEFIELD              )
HEALTHCARE CORPORATION,        )
                                )
        Defendant.             )
_____)

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT, PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND
DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S CROSS-MOTION**

**KOBICK, J.**

This case concerns a hospital employee who was fired after she refused to receive a COVID-19 vaccine. Plaintiff Janice Geronimo worked as a radiologic technologist for defendant Melrose-Wakefield Healthcare Inc. (the "Hospital") until the fall of 2021, when she lost her job for refusing on religious grounds to be vaccinated against COVID-19, as required by the Hospital's COVID-19 policy. Geronimo alleges that she was wrongly terminated on the basis of her religion and retaliated against, in violation of Title VII, 42 U.S.C. § 2000e, and M.G.L. c. 151B. She also claims that the Hospital violated her federal and state constitutional rights and assaulted her. Pending before the Court are the Hospital's motion for summary judgment, Geronimo's cross-motion for summary judgment, and the Hospital's motion to strike Geronimo's cross-motion. For the reasons that follow, the Hospital's summary judgment motion will be granted and the parties' remaining motions will be denied.

## BACKGROUND

The following facts are either undisputed or recounted in the light most favorable to the non-moving party, where supported by record evidence. *See Roberge v. Travelers Prop. Cas. Co. of Am.*, 112 F.4th 45, 51 (1st Cir. 2024) ("This lens . . . do[es] not change where the parties file cross-motions for summary judgment[.]").

The Hospital is a non-profit community healthcare provider owned by Tufts Medicine, Inc., with several locations in the northern suburbs of Boston. ECF 35, ¶¶ 1, 10. From January 2, 2007 to December 1, 2021, Geronimo worked as a radiologic technologist in the Hospital's Diagnostic Radiology Department. *Id.* ¶¶ 3, 33. She was responsible for, among other duties, taking x-rays of patients in the emergency department and using machinery in the operating rooms during surgeries. *Id.* ¶ 4. She interacted with patients, physicians, nurses, and other staff throughout her shifts. *Id.* ¶¶ 4-5.

During the COVID-19 public health emergency, the Hospital provided front-line care to vulnerable populations north of Boston. *Id.* ¶ 6. Between January 31, 2020 and December 2021, it treated 1,237 patients for COVID-19, 281 of whom died from the virus or related complications. *Id.* ¶¶ 7-8. Several hundred of its staff members contracted COVID-19 during this period. *Id.* ¶ 8. When infection rates surged, the Hospital had to convert a unit, and use wings of other units, to care for the influx of patients suffering from COVID-19. *Id.* ¶ 9.

Based on its own experience during the pandemic and the recommendations of the Centers for Disease Control and Prevention ("CDC"), the Hospital knew that healthcare workers had an elevated risk of infecting their patients, including their medically vulnerable patients, with COVID-19, and that healthcare workers themselves faced an increased risk of infection due to transmission from their patients and from other healthcare staff. ECF 37, ¶¶ 15-16. Accordingly,

in June 2021, the Hospital informed all employees via email that they would be required to be vaccinated against COVID-19. ECF 35, ¶ 11; ECF 37-1. This policy was adopted in August 2021. ECF 35, ¶ 11; ECF 37-2, at 1. Based on its experience and the CDC's recommendations, the Hospital determined that mandating vaccination was the best way to prevent the spread of COVID-19 among healthcare staff and between healthcare workers and patients. ECF 35, ¶ 12. The Hospital concluded that any increased risk of COVID-19 transmission would adversely affect staffing, damage its reputation for providing safe care to patients, and increase its exposure to legal liability. *Id.* ¶ 35; ECF 37, ¶¶ 36-37. The Hospital considered alternatives to vaccination—including masking, periodic testing, and social distancing—but determined that these measures would be less effective than the vaccine at reducing transmission. ECF 35, ¶ 26. For example, based on its experience throughout the first year of the pandemic, the Hospital found that social distancing was not always practicable for staff and patients, and that periodic testing would not adequately reduce transmission due to the risk that infected staff members would not be identified on days they were not tested. *Id.* ¶¶ 27-28.

On October 11, 2021, Geronimo, who is Catholic, submitted a request for a religious exemption from the Hospital's COVID-19 vaccination requirement. *Id.* ¶¶ 20-21; ECF 37-3; ECF 42, ¶ 14. Her request stated that "[d]ue to my religious belief I am morally required to listen to my conscience." ECF 35, ¶ 22; ECF 37-3, at 2. In support of her request, she submitted a letter drafted by Pastor Ronald Barker, who heads the Saint Joseph Catholic Parish in Wakefield, Massachusetts. ECF 35, ¶ 21; ECF 37-4. In his letter, Pastor Barker "explain[ed] how the Catholic Church's teachings may lead individual Catholics, including Janice Geronimo, to decline certain vaccines." ECF 37-4, at 1. While recognizing that "the Catholic Church does not prohibit the use of most vaccines, and generally encourages them to safeguard personal and public health," Pastor Barker

3

provided some "authoritative Church teachings demonstrat[ing] the principled religious basis on which a Catholic may determine he or she ought to refuse certain vaccines," including that "[a] person is morally required to obey his or her conscience." *Id.* As an accommodation, Geronimo requested proper personal protective equipment and weekly COVID-19 testing instead of vaccination. ECF 37-3, at 3.[1]

The Hospital denied Geronimo's exemption request in an email dated October 20, 2021. ECF 35, ¶ 32; ECF 37-5. The email stated that "[a]fter careful consideration of your request, we are unable to grant an exemption from the vaccine, due to an undue hardship to MelroseWakefield Healthcare, including impacts to the safety and wellbeing of our employees, patients, and others." ECF 37-5. The letter continued that, "[a]s an alternative accommodation, you may apply for any open role for which you qualify and which may be performed 100% remotely." *Id.* Geronimo never applied for a remote position. ECF 35, ¶ 32. Under the Hospital's COVID-19 policy, "[i]f after November 1st the employee still ha[d] not been immunized or granted an exemption, the employee [would] be found not in compliance with the policy and [would] be terminated." ECF 37-2, at 3. Because Geronimo had not received the COVID-19 vaccine or a religious exemption, the Hospital suspended her employment on November 1, 2021 and fired her on December 1, 2021 for failure to comply with its COVID-19 policy. ECF 35, ¶ 33; ECF 37, ¶¶ 40-41.

The Hospital received at least 32 religious exemption requests, including Geronimo's, between August and December 2021. ECF 35, ¶ 34. It denied each of those requests based on its

---

[1] Geronimo averred in her declaration in support of her cross-motion for summary judgment, and testified similarly at her deposition, that fetal cells were used to develop the COVID-19 vaccines, and that she "cannot accept [them] into [her] body as this is a violation of one of God's commandment's (Thou shall not kill) associated with that practice and allowing the injection would ruin [her] relationship with God." ECF 42, ¶ 15; *see* ECF 41, ¶ 13; ECF 35, ¶¶ 23-24. Her exemption request, however, did not object to the vaccines' use of fetal cells. ECF 35, ¶ 25.

determination that allowing employees to work in person while unvaccinated would impose an undue hardship on its business by increasing safety risks to staff, visitors, and patients. *Id.* ¶ 35.

Geronimo initiated this lawsuit against the Hospital in Middlesex Superior Court in February 2023. ECF 1-3, at 2-7. After she filed an amended complaint, the Hospital removed the case to this Court. ECF 1; ECF 1-3, at 18-24. The operative complaint asserts four claims: (1) a violation of Title VII, 42 U.S.C. § 2000e, and M.G.L. c. 151B, § 4; (2) a violation of Geronimo's equal protection rights under the Fourteenth Amendment; (3) a violation of her substantive and procedural due process rights under the Fourteenth Amendment and Articles 4, 10, 20, 21, 29, and 30 of the Massachusetts Declaration of Rights; and (4) assault. ECF 1-3, at 20-22, ¶¶ 17-36. After discovery, the Hospital moved for summary judgment on all claims. ECF 33. Geronimo filed a combined opposition to that motion and a cross-motion for summary judgment. ECF 40. In response, the Hospital filed a reply and moved to strike Geronimo's cross-motion. ECF 45, 47.[2] Following a hearing, the Court took the parties' motions under advisement. ECF 50.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[2] The Hospital moves to strike Geronimo's cross-motion for summary judgment as untimely and for failure to comply with Local Rule 7.1(a)(2)'s requirement that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." L.R. 7.1(a)(2); *see* ECF 48, at 1-3. True, Geronimo filed her cross-motion a month after the November 8, 2024 deadline for dispositive motions. ECF 32, 40. Geronimo also allegedly failed to confer with the Hospital about her motion. ECF 48, at 3; *see* ECF 40. However, "the law . . . manifests a strong preference that cases be resolved on their merits." *Keane v. HSBC Bank USA for Ellington Tr., Series 2007-2*, 874 F.3d 763, 765 (1st Cir. 2017); *see Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 550 (2010) (describing "the preference expressed in the Federal Rules of Civil Procedure . . . for resolving disputes on their merits"). And while Geronimo has not opposed the motion to strike or established good cause for her late filing, the motion will be denied because, as explained below, the Hospital is entitled, on the merits, to summary judgment on all claims.

Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead "must present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). Where, as here, the parties have filed cross-motions for summary judgment, the court "review[s] each motion 'separately, drawing facts and inferences in favor of the non-moving party.'" *Roberge*, 112 F.4th at 51 (quoting *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020)).

## DISCUSSION

### I.   Religious Discrimination Claims.

Geronimo claims in Count I that the Hospital's failure to accommodate her sincerely held religious beliefs, and its subsequent termination of her employment, amounted to religious discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a), and M.G.L. c. 151B, § 4(1A). Both statutes prohibit employers from discriminating on the basis of religion. *See* 42 U.S.C.

§ 2000e-2(a); M.G.L. c. 151B, § 4(1A). To make out a claim of religious discrimination under the statutes,[3] Geronimo "must first show 'that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action.'" *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 15 (1st Cir. 2024) (quoting *Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023)). If Geronimo makes that showing, "the burden shifts to the Hospital to show that it 'offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship.'" *Id.* (quoting *Lowe*, 68 F.4th at 719); *see also id.* at 17 ("Undue hardship . . . is an affirmative defense.").

The Hospital contends that it is entitled to summary judgment because Geronimo's opposition to the vaccine was not based on a sincerely held religious belief, and, in any event, exempting her from its vaccination requirement would have amounted to an undue hardship. With respect to the Hospital's first argument, the First Circuit has cautioned that credibility determinations regarding the sincerity of an employee's religious beliefs are "quintessential fact questions" that "ordinarily should be reserved 'for the factfinder at trial, not for the court at summary judgment.'" *E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados*, 279 F.3d 49, 56 (1st Cir. 2002) (quoting *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 49 (1st Cir. 1999)); *see Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 90 (1st Cir. 2025) ("Determining whether a belief is religious is 'a difficult and delicate task.'" (quoting *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 132 (1st Cir. 2004))). The Court will therefore assume, without deciding, that Geronimo refused to receive the COVID-19 vaccine

---

[3] Religious discrimination claims under Title VII and Chapter 151B are generally analyzed under the same framework. *See Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 131-32 (1st Cir. 2004); *Brown v. F.L. Roberts & Co., Inc.*, 452 Mass. 674, 676-77 (2008). Because Geronimo points to no difference between the statutes that affects the analysis in this case, the Court analyzes both claims under the Title VII framework.

based on a sincerely held religious belief and proceed to consider the Hospital's undue hardship defense. *See Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 397 (1st Cir. 2025) (same); *Cyr v. Bos. Med. Ctr.*, No. 22-cv-11930-JEK, 2025 WL 269239, at *4 (D. Mass. Jan. 22, 2025) (same).

"The undue hardship defense is built into the statutory definition of religion, such that an employment action cannot constitute discrimination on the basis of religion, and an employer cannot be liable under Title VII for religious discrimination, if the undue hardship defense applies." *Bazinet*, 113 F.4th at 17-18 (citation and quotation marks omitted). To prevail on the defense, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). The undue hardship standard is fact and context specific; it "requires courts to take 'into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer.'" *Bazinet*, 113 F.4th at 18 (quoting *Groff*, 600 U.S. at 470-71). Economic and non-economic costs—including health and safety risks, as well as the risk of reputational injury—are relevant. *See Cloutier*, 390 F.3d at 134-37 (finding undue hardship under pre-*Groff* standard where Costco employee's requested accommodation—to wear facial piercings at work—posed risk of reputational injury); *Cyr*, 2025 WL 269239, at *5 & n.4.

The question before the Court is whether a reasonable jury could find, based on the undisputed material facts, that the Hospital, with the information available to it at the time, could have reasonably accommodated Geronimo's request to be exempted from its COVID-19 policy without suffering substantial increased costs in providing healthcare services. *See Groff*, 600 U.S. at 470; *Rodrique*, 126 F.4th at 90-91 ("[T]o succeed on summary judgment and avoid Title VII liability, [the employer] must show that there was no genuine dispute of material fact that granting

[the plaintiff's] exemption request would have imposed an undue hardship on its business."). The Hospital provided front-line healthcare to Massachusetts residents throughout the COVID-19 public health emergency. ECF 35, ¶ 6. Before implementing the COVID-19 policy, it treated more than 1,200 patients for COVID-19, over 200 of whom died from the virus or related complications. *Id.* ¶ 8. Several hundred of its staff contracted COVID-19 during this period. *Id.* And when infections surged, the Hospital had to convert a unit, and use wings of other units, to care for patients with COVID-19. *Id.* ¶ 9. Based on these experiences and the CDC's recommendations, the Hospital determined that any increased risk of COVID-19 transmission would impede its ability to maintain adequate staffing, harm its reputation for providing safe healthcare to patients, and increase its exposure to liability related to the risk of staff-to-patient COVID-19 transmission. ECF 37, ¶¶ 33, 36-37; *cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (per curiam) ("Stemming the spread of COVID-19 is unquestionably a compelling interest[.]"). Given these same considerations, the Hospital also concluded that mandating vaccination would reduce transmission of COVID-19, and that alternatives to vaccination for healthcare workers— including social distancing, masking, and periodic testing—would be insufficient. ECF 35, ¶¶ 12, 26-28; *cf. Mills*, 16 F.4th at 32-33 ("The COVID-19 vaccines protect against infection and lower the risk of adverse health consequences, including death, should a vaccinated person become infected. Vaccination also reduces a person's risk of transmitting COVID-19 to others.").

In light of these undisputed facts, the Hospital has demonstrated that permitting Geronimo to continue working while unvaccinated would have resulted "in substantial increased costs" in connection with its business as a healthcare provider. *Groff*, 600 U.S. at 470. As a radiologic technologist, Geronimo provided direct patient care across multiple departments, including in the emergency and operating rooms, and interacted with patients and other healthcare workers

throughout her shifts. ECF 35, ¶¶ 3-5. Had she been permitted to continue working while unvaccinated, the Hospital would have faced the increased risk of her contracting COVID-19 and transmitting the virus to its patients and staff members, thereby jeopardizing their safety. *Id.* ¶¶ 12, 26, 35; ECF 37, ¶¶ 14-16; *see Groff*, 600 U.S. at 475 (Sotomayor, J., concurring) ("Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees." (alteration in original)). Permitting Geronimo to work while unvaccinated would have also increased the risk of staffing shortages, which would have harmed the Hospital's ability to provide critical medical care to its patients. ECF 35, ¶¶ 27-28; ECF 37, ¶ 36. Finally, the Hospital would have jeopardized its reputation for furnishing safe care to patients, including those in the emergency and operating rooms. ECF 35, ¶¶ 4, 35; ECF 37, ¶ 37; *see Cloutier*, 390 F.3d at 137 (finding undue hardship based on risk of damage to employer's public image).

Geronimo's principal counterargument is that the Hospital's undue hardship defense rests on an unreliable foundation because, in her view, "[b]eing vaccinated has virtually no effect on preventing the spread of COVID-19." ECF 40, at 13 (emphasis omitted). The First Circuit explained years ago, however, that "COVID-19 vaccines protect against infection," lower the risk of adverse consequences in the case of infection, and "reduc[e] a person's risk of transmitting COVID-19 to others." *Mills*, 16 F.4th at 32-33. More recently, it held that permitting a registered nurse to work while unvaccinated would have posed an undue hardship on a Boston hospital where, as here, it was "uncontroverted that [the hospital] implemented its vaccine requirement based on the CDC's recommendations, which describe vaccines as mitigating the effects and spread of COVID-19." *Melino*, 127 F.4th at 397-98; *see id.* at 394 n.1 (discussing CDC recommendations). The First Circuit has also made clear that when "the record demonstrates that [an employer] relied

on the objective, scientific information available to [it], with particular attention to the views of public health authorities," a court will find that the employer "acted reasonably when it determined that vaccinated employees are less likely to transmit COVID-19 than unvaccinated employees." *Rodrique*, 126 F.4th at 91 (quotation marks omitted). The record here demonstrates precisely that. *See* ECF 35, ¶¶ 12, 26, 28.

To be sure, the magnitude and duration of vaccines' protective effects may still be the subject of debate and study within the scientific community. But ongoing scientific debate regarding the extent of the vaccines' protective effects does not raise a genuine dispute as to whether the vaccines mitigate the risk of an individual contracting and transmitting COVID-19. *See Cyr*, 2025 WL 269239, at *6. In any case, Geronimo has not adduced evidence to support her contention that the COVID-19 vaccines are ineffective. *See Melino*, 127 F.4th at 398; Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by," as relevant here, "citing to particular parts of materials in the record."). She principally relies on allegations in her complaint, but such "[u]nverified allegations in a complaint are not evidence." *Geshke v. Crocs, Inc.*, 740 F.3d 74, 78 n.3 (1st Cir. 2014); *see* ECF 40, at 13 (citing ECF 1-3, at 20-22, ¶¶ 14-16, 21, 27, 34); *Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 312 (1st Cir. 2016) ("[A] party cannot successfully oppose a motion for summary judgment by resting upon mere allegations . . . of his pleading." (quotation marks omitted)). Geronimo's only attempt to introduce evidence appears in her brief, where she provides various quotes from an alleged CDC publication dated June 23, 2022 that she failed to submit to the Court. *See* ECF 40, at 12-13. The publication could not have impacted the Hospital's actions in this case, however, because it was issued well after the Hospital implemented the COVID-19 policy and fired Geronimo in the fall of 2021. These quotes, in any event, do not suggest that COVID-19 vaccines are ineffective at

preventing transmission of the virus. They stand for the unremarkable proposition that "'[p]eople who are vaccinated *may* still get COVID-19'" and "'*can* spread COVID-19 to other people.'" *Id.* (emphases altered). Rather than imply that the vaccine is ineffective, this language merely indicates that the vaccine does not necessarily prevent a person from contracting or spreading COVID-19.

Geronimo's final rejoinder is that she is entitled to summary judgment on her religious discrimination claims "as a matter of contract" because the Hospital allegedly failed to comply with its COVID-19 policy by denying her religious exemption request on undue hardship grounds. ECF 40, at 5 (emphasis and capitalization omitted). This argument fails for several reasons. Since the complaint contains no breach of contract claim, she cannot raise this "new and unadvertised theor[y] of liability for the first time in [her] opposition to [the Hospital's] motion for summary judgment." *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) (quotation marks omitted). Regardless, while the religious exemption section of the COVID-19 policy does not mention undue hardship, the first paragraph of the policy, which outlines its purpose, states that "[r]easonable accommodations will be provided only for medical and/or religious exemptions, provided the accommodation does not pose an undue hardship." ECF 37-2, at 2-3. Geronimo's religious accommodation request form similarly provides at the outset that the Hospital "will provide reasonable accommodations for employees' and applicants' sincerely held religious beliefs or practices unless doing so would impose an undue hardship." ECF 37-3, at 2. The case law is clear, as explained, that federal and state law permit employers to deny religious exemption requests on undue hardship grounds. *See Melino*, 127 F.4th at 397; *Rodrique*, 126 F.4th at 90. Thus, even if Geronimo had previously asserted this theory, undue hardship provided a valid basis

for the Hospital to deny her exemption request and terminate her employment for failure to comply with the vaccination policy.

In sum, the undisputed facts demonstrate that allowing Geronimo to continue working as a radiologic technologist while unvaccinated would have not only jeopardized the health of the Hospital's staff and patients but also risked damaging its reputation for furnishing safe medical care. On this record, no reasonable jury could conclude that the Hospital could have accommodated Geronimo's request for a religious exemption from its COVID-19 policy without incurring these significant costs that, taken together, amount to undue hardship. Accordingly, the Hospital is entitled to summary judgment on Geronimo's religious discrimination claims.

## II.    **Retaliation Claims.**

Geronimo also alleges in Count I that the Hospital's termination of her employment amounted to unlawful retaliation, in violation of Title VII, 42 U.S.C. § 2000e-3(a), and M.G.L. c. 151B, § 4, for her refusal to receive a COVID-19 vaccine. ECF 1-3, at 20, ¶ 20. To make out a prima facie case of retaliation under both statutes, Geronimo "must show that: (1) she . . . engaged in protected conduct; (2) suffered an adverse employment action; and (3) [that] there was a causal connection between the protected conduct and the adverse action." *Jones v. Walgreen Co.*, 679 F.3d 9, 20 n.7 (1st Cir. 2012) (quotation marks omitted). If she can establish a prima facie case, "the burden shifts to [the Hospital] to articulate a legitimate, nondiscriminatory [or nonretaliatory] reason for its employment decision." *Id.* at 20 (quotation marks omitted). If the Hospital meets this burden, Geronimo "must then show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the [Hospital's] retaliatory animus." *Id.* at 21 (quotation marks omitted).

The Hospital contends that even if the refusal to take a COVID-19 vaccine constitutes protected conduct, Geronimo has not provided any evidence that a causal connection exists between that conduct and her loss of employment. Causation is not shown "where the enacted vaccination policies, which specify the consequences of non-compliance in advance, predate any [religious]-based opposition to the policy, including refusal to comply." *Usmanov v. Massachusetts Fin. Servs. Co.*, No. 23-cv-11631-JEK, 2024 WL 4028255, at *5 (D. Mass. Sept. 3, 2024) (quotation marks omitted). Where an employer provides notice of a mandatory vaccination policy and the consequences for noncompliance, and then terminates a plaintiff's employment in accordance with that policy, the plaintiff cannot make out a prima facie case of retaliation unless she offers evidence that goes beyond the employer's mere enforcement of its policy. *See id.*

Such evidence is not present in this action. Geronimo does not proffer evidence that she opposed COVID-19 vaccination before the Hospital announced its policy in August 2021, such that an inference of retaliation may be made. ECF 35, ¶ 11. Nor is there any evidence allowing for an inference that the Hospital retaliated against her for opposing its mandate. Rather, the record shows that the Hospital terminated Geronimo's employment after it denied her request for a religious exemption. *Id.* ¶¶ 11, 13, 21, 32-33. Even viewed in the light most favorable to Geronimo, the record demonstrates that she was fired for refusing to comply with the Hospital's COVID-19 policy, not for engaging in protected conduct. Geronimo's brief fails to provide a single record or case citation to dispute this conclusion. *See* ECF 40, at 14. Accordingly, the Hospital is entitled to summary judgment on Count I.

III.    <u>**Federal and State Constitutional Claims.**</u>

Geronimo also asserts federal and state constitutional claims against the Hospital. Count II alleges that the Hospital violated Geronimo's equal protection rights under the Fourteenth Amendment by treating her differently than her coworkers who opted to receive a COVID-19 vaccine, including by ultimately terminating her employment. ECF 1-3, at 21, ¶¶ 22-26. And Count III alleges that the Hospital violated her substantive and procedural due process rights under the Fourteenth Amendment and Articles 4, 10, 20, 21, 29, and 30 of the Massachusetts Declaration of Rights by refusing to provide her "a fair process" to consider her "sincerely held religious belief[s]" before denying her request for a religious accommodation from the COVID-19 policy. *Id.* at 21-22, ¶¶ 28-33.

Geronimo's federal constitutional claims are asserted pursuant to 42 U.S.C. § 1983, which "furnishes a private right of action against any person who, while acting under color of state law, deprives another (or causes another to be deprived) of rights secured either by the Constitution or by federal law." *Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th 538, 543 (1st Cir. 2021). To state a section 1983 claim, Geronimo must show that the Hospital "acted under color of state law and caused the deprivation of federal rights." *Id.* Section 1983 "does not apply to 'merely private conduct, no matter how discriminatory or wrongful.'" *Grapentine v. Pawtucket Credit Union*, 755 F.3d 29, 31 (1st Cir. 2014) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)).

Geronimo fails to adduce evidence that the Hospital acted under color of state law or that its conduct was "'fairly attributable to the State'" when it terminated her employment. *Cruz-Arce*, 19 F.4th at 543 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). The undisputed record establishes that the Hospital is a private, non-profit community healthcare provider owned by Tufts. ECF 35, ¶¶ 1, 10. Three tests exist to determine whether a private party, like the Hospital,

can fairly be characterized as a state actor: "the public function test, the joint action/nexus test, [and] the state compulsion test." *3137, LLC v. Town of Harwich*, 126 F.4th 1, 9 (1st Cir. 2025) (quotation marks omitted). Geronimo offers no argument or evidence to support treating the Hospital as a state actor under any of these tests. *See* ECF 40; *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 19 (1st Cir. 2009) ("[I]ssues adverted to . . . in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." (quotation marks omitted)). Absent evidence that the Hospital satisfies any of these tests, the Hospital, as a private entity, cannot fairly be considered a state actor.[4] *See* ECF 35, ¶ 1; *Klunder v. Brown Univ.*, 778 F.3d 24, 34 (1st Cir. 2015) (upholding partial grant of summary judgment for Brown University because it was "not a state actor subject to federal jurisdiction under § 1983"); *Méndez v. Belton*, 739 F.2d 15, 17-19 (1st Cir. 1984) (affirming summary judgment of section 1983 claim for Presbyterian Hospital as "a private, non-profit corporation"). The Hospital is, accordingly, entitled to summary judgment on Counts II and III alleging violations of federal constitutional rights.

For the same reason, Geronimo's substantive and procedural due process claims under the Massachusetts Declaration of Rights fail as a matter of law. The Supreme Judicial Court has explained that "the concept of due process of law" under the Massachusetts Declaration of Rights "inherently is concerned with governmental action." *Phillips v. Youth Dev. Program, Inc.*, 390 Mass. 652, 658 (1983); *see also Bos. Phoenix, Inc. v. New England Tel. & Tel. Co.*, 5 Mass. L.

---

[4] The fact that the Hospital receives state or federal funds and decided in the summer of 2021 to require employees to be vaccinated based on the recommendation of state and federal agencies does not change this analysis, ECF 37, ¶¶ 5, 14, because "government regulation, even extensive regulation, and the receipt of federal funds, . . . are insufficient to establish that a hospital or other entity acted under color of state law," *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 258 (1st Cir. 1994).

Rptr. 547, 1996 WL 473998, at *13 (Mass. Super. Ct. Aug. 12, 1996) ("state action is required" with "respect to Art. 12 (due process)").[5] Geronimo, once again, points to no evidence that the Hospital's vaccine policy or its termination of her employment bore any nexus to government action, even a nexus less robust than that required by the federal Constitution. *See Phillips*, 390 Mass. at 658-59 (because the SJC "may fashion its own concepts of due process of law under the Constitution of the Commonwealth," it "need not define State action as the Supreme Court of the United States has defined State action for Fourteenth Amendment and § 1983 purposes" in "determining what is State action for State due process of law purposes"). The Hospital is therefore entitled to summary judgment on Geronimo's due process claims under the Massachusetts Declaration of Rights as well.

## IV.    <u>Assault Claim.</u>

Geronimo finally asserts in Count IV a claim of assault against the Hospital for allegedly placing her "in fear and apprehension of imminent bodily harm." ECF 1-3, at 22, ¶ 36. "Under the common law, an assault may be accomplished in one of two ways—either by an attempted battery, or by putting another in fear of an immediately threatened battery." *Commonwealth v. Gorassi*, 432 Mass. 244, 247 (2000). Where, as alleged here, "an assault involves a threatened battery," the plaintiff "must prove that the defendant engaged in objectively menacing conduct with the intent to put the victim in fear of immediate bodily harm." *Commonwealth v. Andrade*, 488 Mass. 522,

---

[5] Not all provisions of the Declaration of Rights are exclusively directed at restraining government action. Article 9, which protects a right of ballot access, encompassing a right to solicit nominating signatures in support of that access, does not require state action. *See Batchelder v. Allied Stores Int'l, Inc.*, 388 Mass. 83, 88-89 (1983). And the Supreme Judicial Court has left open the question whether the free speech protections of Article 16 require state action. *See Glovsky v. Roche Bros. Supermarkets*, 469 Mass. 752, 755 n.4 (2014) ("[A]rt. 16 of the Massachusetts Declaration of Rights, which protects free speech, may contain a State action requirement." (citing *Roman v. Trustees of Tufts Coll.*, 461 Mass. 707, 713 (2012))).

543 (2021) (quotation marks omitted). "The victim's apprehension of imminent physical harm must be reasonable," *Commonwealth v. Lavrinenko*, 473 Mass. 42, 56 (2015) (quotation marks omitted), which "depends in part on the actions and words of the defendant in light of the attendant circumstances," *Commonwealth v. Walters*, 472 Mass. 680, 692 (2015) (quotation marks omitted).

This claim fails for two reasons. As an initial matter, Geronimo's "failure to put forth any argument in her opposition to [the Hospital's] motion for summary judgment . . . constitutes abandonment" of her assault claim. *Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017). And in any case, the record lacks any evidence that the Hospital's COVID-19 policy constitutes "objectively menacing conduct" that would place a reasonable person in fear of imminent bodily harm. *Gorassi*, 432 Mass. at 248 (quotation marks omitted). The Hospital is, accordingly, entitled to summary judgment on Count IV.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, MelroseWakefield Healthcare Inc.'s motion for summary judgment, ECF 33, is GRANTED. Geronimo's cross-motion for summary judgment, ECF 40, is DENIED. MelroseWakefield's motion to strike Geronimo's cross-motion for summary judgment, ECF 47, is DENIED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: July 22, 2025